No. 86,746

In the Matter of BRADLY W. JOHNSON, *Respondent*.

(32 P.3d 1132)

Opinion filed October 19, 2001.

*Stanton A. Hazlett*, disciplinary administrator, argued the cause and was on the formal complaint for petitioner.

*Bradly W. Johnson*, respondent, argued the cause pro se.

*Per Curiam*: This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against Bradly W. Johnson, of Olathe, an attorney admitted to the practice of law in Kansas.

Two separate complaints were filed against respondent. A formal hearing was had on said complaints before a hearing panel of the Kansas Board for the Discipline of Attorneys. The hearing panel concluded that respondent had violated KRPC 1.1 (competence) (2000 Kan. Ct. R. Annot. 300), KRPC 1.3 (diligence) (2000 Kan. Ct. R. Annot. 310), KRPC 1.4 (communication) (2000 Kan. Ct. R. Annot. 320), KRPC 1.16 (declining or terminating representation) (2000 Kan. Ct. R. Annot. 371), and KRPC 8.4 (a), (c), (d), and (g) (misconduct) (2000 Kan. Ct. R. Annot. 420), and Supreme Court Rule 207 (failure to cooperate) (2000 Kan. Ct. R. Annot. 237) and recommended respondent be suspended from the practice of law for a period of 2 years. No exceptions have been filed.

It is appropriate, at this point, to include the panel's final hearing report in this opinion almost in toto in order to fully understand the panel's findings, conclusions, recommendations, and concerns. Some editing of format has been done.

### "FINDINGS OF FACT

"The testimony presented in this case conflicted on many points. In making its findings of fact, the Hearing Panel considered the testimony and arguments presented, the demeanor of the witnesses, the corroboration of the evidence, the exhibits admitted into evidence, and the briefs filed after the close of the evidence. The Hearing Panel finds that clear and convincing evidence supports the following facts:

"1. Bradly W. Johnson (hereinafter 'the Respondent') is an attorney at law, Kansas Attorney Registration No. 17849. His last registration address with the Clerk of the Appellate Courts of Kansas is . . . Olathe, Kansas. . . . Immediately after being admitted to the practice of law in the state of Kansas in 1995, the Respondent and three law school classmates formed a partnership. Throughout the Respondent's five years of practice, the Respondent has practiced in that partnership. The Respondent is also licensed to practice law in Missouri. At the time of the hearing, the Respondent was 31 years of age.

### "Roberts Complaint (DA7699)

"2. On April 19, 1998, Phyllis Roberts contacted the Respondent, seeking representation of her husband, Randall K. Roberts, in connection with an outstanding warrant for his arrest which had been issued in Kansas, based upon a probation violation. The Respondent told Mr. Roberts that the fee for the representation would be $500.00. The Respondent explained to Mr. Roberts that he would accept $100.00 per week and agreed to start work on the case when he had received $300.00.

"3. When Mr. Roberts had paid $400.00, Mr. Roberts called the Respondent. The Respondent asked Mr. Roberts to meet with him in his office. On June 2, 1998, Mr. and Mrs. Roberts met with the Respondent. At that time, they provided the Respondent with all available information and paperwork they had regarding the arrest warrant.

"4. The meeting on June 2, 1998, was the only time the Respondent personally met with Mr. or Mrs. Roberts.

"5. Following the meeting with Mr. and Mrs. Roberts, the Respondent contacted members of the Johnson County District Attorney's office, a Court Services Officer, and other court personnel regarding the outstanding warrant for Mr. Roberts' arrest. The Respondent was informed that the Court Services Officer and the Assistant District Attorneys would not agree to set aside the arrest warrant and that, in order for Mr. Roberts' case to be scheduled for hearing, Mr. Roberts would have to surrender himself to the Johnson County authorities.

"6. After the June 2, 1998 meeting at the Respondent's office, Mrs. Roberts telephoned the Respondent on numerous occasions, attempting to learn the status of the case. The Respondent avoided Mrs. Roberts' telephone calls and, as a result, Mrs. Roberts was able to reach the Respondent on only a couple of occasions. During those telephone conversations, the Respondent assured Mrs. Roberts that he was working on the case. The Respondent failed to communicate to Mr. Roberts that he would have to surrender himself in order for the case to be scheduled for hearing. [Footnote: The Respondent testified that he fully informed Mrs. Roberts that Mr. Roberts would have to surrender himself to the authorities in order for his case to be heard. However, based upon all of the evidence, including the testimony of Mr. Roberts, Mrs. Roberts, and the Respondent, the Hearing Panel finds Mrs. Roberts' testimony on the issue to be credible.]

"7. On most occasions when Mrs. Roberts telephoned the Respondent, however, Mrs. Roberts was unable to contact the Respondent. On those occasions, Mrs Roberts left messages, requesting that the Respondent return the telephone call. The Respondent did not return Mrs. Roberts' telephone calls.

"8. Additionally, on December 1, 1998, Mrs. Roberts sent a letter to the Respondent. The Respondent failed to respond to Mrs. Roberts' letter.

"9. The Respondent never provided Mr. or Mrs. Roberts with any written correspondence regarding the status of the case.

"10. To date, the Respondent has not returned any unearned fees to Mr. Roberts. The Respondent testified that he had charged Mr. Roberts a 'flat fee' and that he had earned his fee based upon the amount of time that he had invested in the case.

"11. In October, 1999, Mr. Roberts sent a letter of complaint to the Office of the Disciplinary Administrator. Thereafter, the case was referred to the Ethics and Grievance Committee of the Johnson County Bar Association for investigation. Michael E. Whitsitt was assigned to investigate Mr. Roberts' complaint. Mr. Whitsitt wrote to the Respondent twice and placed a telephone call to the Respondent, requesting that the Respondent provide a written response to Mr. Roberts' initial letter of complaint. The Respondent failed to respond to Mr. Roberts' complaint.

*"Nobles Complaint* (DA7910)

"12. In early 1997, Waymond Nobles read an advertisement in *Pitch Weekly* regarding the Respondent's firm. The advertisement indicated that the firm handled employment discrimination cases. [Footnote: At the hearing on this matter, the Respondent testified that prior to accepting Mr. Noble's case, neither he nor any of his partners had ever handled an employment discrimination case.] Based upon the advertisement, Mr. Nobles contacted the Respondent. During the relevant times in 1997 and thereafter, Mr. Nobles was a resident of Springfield, Missouri. The Respondent and Lee Davidson (one of the Respondent's partners) traveled to Springfield, Missouri, and met with Mr. Nobles.

"13. Thereafter, Mr. Nobles retained the Respondent to file and prosecute a claim of race discrimination in his behalf against Mr. Nobles' former employer, the Boys and Girls Town of Missouri. Mr. Nobles and the Respondent entered into a contingency fee agreement.

"14. On June 3, 1997, the Respondent filed a complaint in the United States District Court for the Western District of Missouri, Southern Division. The complaint was captioned: *Waymond Nobles v. Boys and Girls Town of Missouri, et al.*, case number 97-3282-CV-S-RGC. In the complaint, the Respondent alleged that Mr. Nobles had been terminated from his employment in violation of Title VII of the Civil Rights Act of 1964.

"15. During the course of his representation, the Respondent traveled to Springfield, Missouri, on three or four occasions to meet with Mr. Nobles.

"16. Prior to filing the complaint, the Respondent conducted no investigation into the allegations underlying Mr. Noble's claim other than his interview with Mr. Noble. Several names of potential witnesses were provided to the Respondent. The Respondent did not interview any witnesses.

"17. During the pendency of the complaint, Mr. Nobles placed numerous telephone calls to the Respondent. The Respondent failed to return nearly all of Mr. Nobles' telephone calls. Additionally, Mr. Nobles expected to receive monthly status reports. The Respondent did not provide monthly status reports to Mr. Nobles. Mr. Nobles' expectation of attention from the Respondent and communication with the Respondent was unreasonable. However, the Respondent failed to maintain reasonable communication with Mr. Nobles.

"18. In June, 1998, Mr. Nobles became concerned about the status of his case. Because the Respondent was not keeping Mr. Nobles informed, Mr. Nobles traveled to the Clerk's office and obtained a copy of the docket sheet associated with his case. At that time, he learned that the deadline for formal discovery was slated for July 1, 1998.

"19. On June 18, 1998, Mr. Nobles sent a letter to the Respondent inquiring about the Respondent's failure to conduct discovery and failure to communicate with him about the status of the case. The Respondent did not reply to the letter.

"20. The discovery deadline passed and the Respondent conducted no discovery. On direct examination by the Disciplinary Administrator, the Respondent testified as follows:

'Q. Did you take any witness statements?

'A. No, I did not.

'Q. Did you depose anybody?

'A. No, we did not.

'Q. Did you make a decision that discovery by way of depositions or interrogatories was not necessary in this case?

'A. We had gotten very extensive discovery from the defendant. The motion for summary judgment was docketed, and we went that route. We—that's all.

'MR. PALMER [Panel Member]: I'm sorry. I didn't understand the question. Mr. Hazlett asked you—or the answer. I understood the question. Mr. Hazlett asked you if you made a decision as to whether discovery was necessary on the part of the plaintiff in this case. I mean, that's kind of a "yes" or "no" thing. Did you do any discovery or not.

'MR. JOHNSON: Yes, we did discovery.

'MR. PALMER: What did you do?

'Q. (by Mr. Hazlett) [Disciplinary Administrator] What discovery did you do?

'A. We got extensive discovery from the defendant, went through it at length. We did not provide discovery to the other side, as it was never compelled. We continually tried to track down these juveniles who were on the run or in the facility.

'Q. What about Mr. Nobles' superiors? Did you think it was necessary to depose them?

'A.  I would have deposed them after summary judgment, yes.

'Q.  I'm sorry. You would have deposed them after summary judgment?

'A.  Yes.

'Q.  Wasn't there a discovery deadline, though, of July 1st, 1998?

'A.  That was on the initial disclosures was my understanding, yes. At that point, we had—I talked to Waymond and we had made a decision to try to keep discovery as close to the vest as possible as far as giving anything away of his case. They weren't successful in compelling our testimony or his deposition or his interrogatories.

'MR. MCCAMISH [Panel Member]: I'm not following that either. I'm sorry. Say again what you mean by playing close to the vest on discovery as far as the discovery from the plaintiff.

'MR. JOHNSON: Waymond—I had Waymond provide responses. We had interviewed Waymond. He had gotten affidavits from Waymond. He had prepared everything that the other side would want. However, the other side was never successful in, I guess, getting an order compelling us to turn those over, and they had given us everything they had.

. . . .

'Q.  Did you provide your initial disclosures?

'A.  No.

'Q.  Why not?

'A.  As I said, I was going to make the defendants work to get what we had. And if you'll look on the next page, 26, Judge Clark dismissed the motion to compel production.

'Q.  Why did that happen? Do you recall?

'A.  I do not recall off the top of my head, and I don't want to venture a guess. I believe it was not noticed up correctly, and they never revisited it.

'Q.  What do you mean by making the defendants work to get what you had?

'A.  We were a firm of four people. They were a fairly large firm. I felt no inclination just to hand them something and make their job easier until I made them actually try to jump through hoops, because I knew they would eventually make me jump through hoops, being a smaller firm.

'Q.  By making them jump through the hoop, would that be forcing them to file a motion to compel you to give them what you had?

'A.  Yes.'

"21.  On August 17, 1998, the defendants filed a motion for summary judgment. On September 4, 1998, the court ordered that the Respondent file a response to the motion for summary judgment on or before September 25, 1998. The Respondent did not file a response to the motion for summary judgment on or before September 25, 1998.

"22.  On September 28, 1998, the Respondent filed a motion to extend the deadline to respond to the motion for summary judgment. The court granted the Respondent's motion and ordered that the Respondent respond to the motion for

summary judgment on or before October 26, 1998. The Respondent did not file a response to the motion for summary judgment on or before October 26, 1998.

"23. On October 29, 1998, the Respondent filed suggestions in opposition to the motion for summary judgment. The pleading, prepared by the Respondent contained no authority, and was supported only by a self-serving conclusory affidavit from Mr. Nobles.

"24. Although the suggestions in opposition to the motion for summary judgment were filed three days after the extended deadline, the Respondent testified that the pleading was timely filed:

'Q. And looking at Exhibit 6 again, it has a file stamp on it of October 29 of 1998, so that document, in fact, was not filed in compliance with the judge's order, was it?

'A. Yes, it was. There's an additional—I don't want to misstate the rule. There may be actually additional time, but there's a minimum of additional time when notified by mail of the order, and that's what we were.'

"25. On November 18, 1998, the court granted the motion for summary judgment.

"26. Mr. Nobles learned of the entry of judgment by obtaining a copy of the docket sheet associated with his suit. [Footnote: The Respondent testified that upon learning of the entry of judgment, the Respondent telephoned Mr. Nobles and informed him of the ruling. The Respondent further testified that Mr. Nobles' testimony on his subject was 'not correct.' The Hearing Panel finds Mr. Nobles' testimony to be credible and finds the Respondent's testimony on this subject to be not believable.] After learning of the entry of judgment, Mr. Nobles contacted the Respondent by telephone. During that telephone conversation, the Respondent agreed to file an appeal from the ruling on the summary judgment motion. At the hearing on the formal complaint, Mr. Palmer and the Respondent engaged in the following exchange:

'Q. Was it your opinion that the trial court in the Western District of Missouri's decision granting defendant's summary judgment was correct? I mean, at the time you received it, was that your opinion?

'A. Objectively speaking, yes. I would liked it not to have been, but yes.

'Q. But you agreed to file an appeal notwithstanding?

'A. Yes.'

"27. On December 18, 1998, the Respondent filed a notice of appeal with the United States Court of Appeal for the Eighth Circuit (case number 98-4214). Mr. Nobles' brief was due on February 9, 1999. The Respondent did not file a brief in behalf of Mr. Nobles by February 9, 1999.

"28. On February 9, 1999, the Respondent mailed a letter to the Clerk for the United States Court of Appeals, Eighth Circuit, requesting additional time to file a brief in behalf of Mr. Nobles. It is not clear, from the record, if the court took any action as a result of the Respondent's letter of February 9, 1999.

"29. Thereafter, on March 3, 1999, the court issued an order to show cause why the appeal should not be dismissed for want of prosecution. In its order, the court permitted the Respondent 15 days to respond to the order.

"30. On March 23, 1999, Mr. Nobles filed a response to the order to show cause. On March 31, 1999, the court dissolved the order to show cause and ordered that the Respondent file a brief in behalf of Mr. Nobles by April 2, 1999.

"31. The Respondent did not file a brief in behalf of Mr. Nobles by April 2, 1999. However, the Respondent told Mr. Nobles that he had filed a brief. The following testimony by Mr. Nobles addresses this issue:

'A. . . . He stated that he had filed those briefs, they had already been mailed, and that they should have got them. The clerk said, "No, if the mail would have came here, the briefs would have been stamped, and we would have received them."

'Q. Is that the first time that Mr. Johnson stated that the brief in the appeal had been filed?

'A. Yes.

'Q. And that was in a conversation, a three-way conversation between you and the clerk and Mr. Johnson?

'A. Yes, the clerk in the federal court in St. Louis.

'Q. And, specifically, tell me again what it was that Mr. Johnson said about the brief in the case.

'A. Mr. Johnson said he had already mailed the brief, and that they should have received them, and that they should have got them, and the lady was telling him that they hadn't got them. And then I had to file, myself, I had to file for an extension of time. . . .

[Footnote: The Respondent denies making this statement to Mr. Nobles and a Clerk of the Eighth Circuit Court of Appeals. However, the Hearing Panel finds that Mr. Nobles testimony on this matter is credible, and the Respondent's testimony is not.]

"32. On April 27, 1999, the court issued a second order to show cause why the appeal should not be dismissed for failure to prosecute. In its order, the court gave the Respondent 15 days to respond to the order.

"33. Curiously, the Respondent interpreted the court's order to show cause as an extension of time to file his brief. The following transcript excerpts establish the Respondent's position:

'Q. [By Mr. Hazlett] Did you comply with the briefing schedule?

'A. Yes, I did, until terminated by Mr. Nobles. I was—I was not out of compliance with the briefing schedules.

'Q. You're saying, now, when were you—at what date were you fired by Mr. Nobles?

'A. April 29th, the day that he testified we had a three-way phone call.

. . . .

'Q. Is it your indication that you were fired on April 29 of 1999?

'A. Yes.

'Q. So weren't you responsible for filing that brief that was due April 2nd?

'A. I had discussed the matter—

'MR. PALMER: Now, the answer calls for "yes" or "no." Were you responsible for filing a brief on April 2, 1999, in the 8th Circuit?

'MR. JOHNSON: Yes.

'Q.  (By Mr. Hazlett) Did you file a brief?

'A.  No.

. . . .

'Q.  On April 27th of 1999—again, I'm on Page 58 of Exhibit 8—a show cause order was issued. Did you ever respond to the—you, did you ever respond to the show cause order?

'A.  The one that was issued on the 27th of April?

'Q.  Right.

'A.  No, sir.

'Q.  Why not?

'A.  In my mind, I was terminated on the 29th of April.

. . . .

'Q.  [By Mr. Rohrbaugh] [Counsel for Respondent] . . . What work had you done toward getting a brief filed?

'A.  Gotten all the cases I thought I would need. I was ready to write a brief. At the time I was fired, I had at least, by my calculations, two weeks to get it done. I was ready to do it. I've always found, in anything I've done, the hard part is getting to that point where you sit down and write it. It is something that could have been done. I had done the hard work, the leg work, the research trying to find anything that would support my position. I was fired two days after I got the order giving me time to get it done.

. . . .

'BY MR. MCCAMISH :

. . . .

'Q.  By your calculation, before you were fired, you had two weeks to do the brief?

'A.  Yes, Judge.

'Q.  Was that as a result of the show cause order issued on April 27th?

'A.  Yes. There was the show cause order issued on the 27th. That gave two weeks, 15 days from the date of that order, plus the additional time for mailing. I was fired two days after that order was actually entered.

'Q.  Okay. Did the show cause order, as the docket sheet indicates, direct you to show cause why the appeal should not be dismissed for failure to prosecute?

'A.  Yes, it did that.

'Q.  Was that, by your interpretation, a two-week extension of time to file a brief in the case?

'A.  Yes.'

"34.  Although the Respondent testified that Mr. Nobles terminated the Respondent's representation on April 29, 1998, the Respondent never filed a motion to withdraw from the representation. [Footnote: Again, the Hearing Panel finds

that Mr. Nobles' testimony is credible and that Mr. Nobles did not fire the Respondent.]

"35.  On May 13, 1999, Mr. Nobles personally filed a response to the order to show cause. On May 19, 1999, the court granted Mr. Nobles until June 4, 1999, to file a brief or have a new attorney enter an appearance.

"36.  Because the Respondent abandoned Mr. Nobles, on June 4, 1999, Mr. Nobles filed a brief, *pro se*. On July 14, 1999, the defendants filed their briefs. Thereafter, on October 28, 1999, the United States Court of Appeals for the Eighth Circuit affirmed the judgment of the district court.

"37.  On September 12, 1999, Mr. Nobles sent a letter of complaint to the Missouri disciplinary authorities. [Footnote: Because Mr. Johnson's office is located in Olathe, Kansas, the Missouri disciplinary authorities forwarded a copy of Mr. Nobles' letter of complaint to the Kansas Office of the Disciplinary Administrator. The Missouri disciplinary authorities are awaiting the outcome of this disciplinary proceeding before taking action on Mr. Nobles' complaint.] On April 20, 2000, Frank D. Diehl, Deputy Disciplinary Administrator sent a letter to the Respondent, notifying the Respondent that Mr. Nobles had filed a complaint. Mr. Diehl asked the Respondent to respond to the complaint in writing within twenty days. The Respondent failed to do so. Thereafter, the case was referred to the Ethics and Grievance Committee of the Johnson County Bar Association for investigation. Steven D. Ruse was assigned to investigate Mr. Nobles' complaint. Mr. Ruse sent the Respondent two letters requesting that the Respondent provide a written response to Mr. Nobles' initial letter of complaint. The Respondent failed to respond."

Based upon these findings of fact the panel concluded respondent had violated KRPC 1.1 (competence) (2000 Kan. Ct. R. Annot. 300), KRPC 1.3 (diligence) (2000 Kan. Ct. R. Annot. 310), KRPC 1.4 (communication) (2000 Kan. Ct. R. Annot. 320), KRPC 1.16 (declining or terminating representation) (2000 Kan. Ct. R. Annot. 371), and KRPC 8.4 (a), (c), (d), and (g) (misconduct) (2000 Kan. Ct. R. Annot. 420), and Supreme Court Rule 207 (2000 Kan. Ct. R. Annot. 237). The panel held as follows:

"2.  Lawyers must provide competent representation to their clients. KRPC 1.1. 'Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.' In the Nobles case, the Respondent did not competently represent Mr. Nobles. The Respondent failed to initially investigate Mr. Nobles' claim, the Respondent failed to competently evaluate the value of the claim, the Respondent failed to conduct appropriate discovery during the pendency of the case, the Respondent failed to competently respond to the motion for summary judgment, and the Respondent failed

to competently prosecute the appeal. Accordingly, the Hearing Panel concludes that the Respondent violated KRPC 1.1.

"3. Attorneys must act with reasonable diligence and promptness in representing their clients. *See* KRPC 1.3. The Respondent failed to act with reasonable diligence and promptness in representing Mr. Nobles when he failed to diligently investigate the claim, when he failed to conduct discovery and appropriately respond to requests for discovery by the defendants, when he failed to timely file a response to the motion for summary judgment, and when he failed to timely file a brief on appeal. As such, the Hearing Panel concludes that the respondent violated KRPC 1.3.

"4. KRPC 1.4(a) requires attorneys to keep clients 'reasonably informed about the status of a matter.' The Hearing Panel concludes that the Respondent violated KRPC 1.4(a) as follows:

a. In the *Roberts* case, the Respondent violated KRPC 1.4(a) when he failed to return telephone calls, respond to letters, and keep Mr. and Mrs. Roberts reasonably informed about the status of their representation.

b. With regard to Mr. Nobles, the Respondent violated KRPC 1.4(a) when he failed to return telephone calls, respond to letters, and keep Mr. Nobles reasonably informed about the status of his case. The Hearing Panel is aware that Mr. Nobles was a difficult client and requested case status information more often than reasonable; however, the Hearing Panel finds that Respondent failed to respond to Mr. Nobles' reasonable requests timely.

"5. KRPC 1.16(d) provides, as follows:

'Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee that has not been earned. The lawyer may retain papers relating to the client to the extent permitted by other law.'

By failing to notify Mr. Roberts that he was terminating the representation, and by failing to return any unused advance payments, the Respondent failed to take steps reasonably necessary to protect Mr. Roberts' interests. As such, the Hearing Panel concludes that the Respondent violated KRPC 1.16.

"6. 'In the course of representing a client a lawyer shall not knowingly make a false statement of material fact or law to a third person.' KRPC 4.1(a). In the Nobles case, the Respondent made a false statement, when he told Mr. Nobles that he had filed an appellate brief in behalf of Mr. Nobles. As such, the Hearing Panel concludes that the Respondent violated KRPC 4.1(a).

"7. KRPC 8.4 provides, as follows:

'It is professional misconduct for a lawyer to:

'(a) Violate or attempt to violate the rules of professional conduct, knowingly assist or induce another to do so, or do so through the acts of another.

. . . .

'(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

'(d) engage in conduct that is prejudicial to the administration of justice;
. . . .

'(e) engage in any other conduct that adversely reflects on the lawyer's fitness to practice law.'

In this case, the Hearing Panel concludes that the Respondent violated KRPC 8.4(a), KRPC 8.4(c), KRPC 8.4(d), and KRPC 8.4(g).

a. When the Respondent failed to cooperate in the disciplinary investigation, in violation of Kan. Sup. Ct. R. 207, the Respondent '[vi]olate[d] . . . the rules of professional conduct,' in violation of KRPC 8.4(a).

b. The Respondent violated KRPC 8.4(c) when he falsely told Mr. Nobles that he had filed an appellate brief in Mr. Nobles behalf, when he had not.

c. The Respondent violated KRPC 8.4(d) when he failed to timely respond to the motion for summary judgment and failed to file a brief on appeal in Mr. Nobles case.

d. Finally, the Respondent violated KRPC 8.4(g) when he falsely told Mr. Nobles that he filed an appellate brief when he had not and when he failed to cooperate in the disciplinary investigation.

"8. Kan. Sup. Ct. R. 207(b) provides as follows:

'It shall be the duty of each member of the bar of this state to aid the Supreme Court, the Disciplinary Board, and the Disciplinary Administrator in investigations concerning complaints of misconduct, and to communicate to the Disciplinary Administrator any information he or she may have affecting such matters.'

The Hearing Panel concludes that the Respondent violated Kan. Sup. Ct. R. 207(b) by failing to provide written responses to the initial complaints or otherwise comply with the requests of the Office of the Disciplinary Administrator and the disciplinary investigators."

The panel then recommended the discipline of 2 years' suspension from the practice of law. In making this recommendation the panel stated as follows:

## "RECOMMENDATION

"In making this recommendation for discipline, the Hearing Panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"*Duty Violated.* The Respondent violated his duty to his clients, the legal system, and the public.

"*Mental State*. The Respondent knowingly violated his duties.

"*Injury*. The Respondent's misconduct potentially injured Mr. Roberts, although actual injury is not apparent. In regard to Mr. Nobles, the Respondent's misconduct caused actual injury to the administration of justice and potential injury to Mr. Nobles.

"*Aggravating or Mitigating Factors*. Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case found the following aggravating factors present:.

"*Multiple Offenses*. The Respondent violated multiple disciplinary rules in two separate cases. This element applies.

"*Bad Faith Obstruction of the Disciplinary Proceeding by Intentionally Failing to Comply with Rules or Orders fo the Disciplinary Process*. The Respondent completely ignored the disciplinary investigation and intentionally failed to comply with Kan. Sup. Ct. R. 207. The Respondent's flippant attitude toward the disciplinary process was exhibited at the hearing on this matter as follows:

'Q. [By Mr. Rohrbaugh] When the investigation began and a letter comes across the bow saying, "I'm investigating this case," what did you do with the letters?

'A. I have a drawer at work where I put them.

'Q. Stuck them in the proverbial bottom drawer; is that correct?

'A. Top right, but it served the same purpose.'

Accordingly, the Hearing Panel finds that the Respondent engaged in a bad faith obstruction of the disciplinary process.

"*Submission of False Evidence, False Statements, or Other Deceptive Practices During the Disciplinary Process*. The Hearing Panel concludes that the Respondent's testimony at the hearing was less than forthright and, as shown by the Findings of Fact, not entitled to credit on some issues.

"*Refusal to Acknowledge Wrongful Nature of Conduct*. Although the Respondent acknowledged that he failed to cooperate in the disciplinary investigations and that he did not diligently pursue Mr. Nobles' appeal, the Respondent steadfastly denied that his conduct violated any other rules of professional conduct and, instead, blamed Mr. and Mrs. Roberts and Mr. Nobles for instituting complaints. As such, the Hearing Panel concludes that the Respondent has, at no time during his representation of either party or during the entire pendency of this proceeding acknowledged to himself, or others, the gravity of his actions.

"Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following mitigating circumstances present: [Footnote: In addition, the Respondent presented evidence concerning certain personal problems that he experienced during the time the misconduct occurred. Included with his brief (and therefore not subject to cross-examination), the Respondent provided a report from his therapist. The therapist indicates that the Respondent has a defense mechanism of withdrawal

when confronted by stressful issues. The Hearing Panel finds, however, the Respondent's personal problems do not to mitigate the conduct.

"Finally, following the formal hearing, the Respondent submitted a letter to the Hearing Panel, expressing remorse for his actions. The Hearing Panel was in a position to assess the Respondent's testimony and demeanor at the hearing and finds that the Respondent's expression of 'remorse' to be in contravention to the attitude he projected at the hearing. The Hearing Panel believes this 'remorse' to be similar to a 'jail house conversion,' and a last minute recognition of the response of the Hearing Panel to his testimony rather than an acknowledgment of the wrongful nature of his actions. As such, the Hearing Panel does not find that the Respondent's 'remorse' is a factor in mitigation.]

"*Absence of Prior Disciplinary Record.* The Respondent has not previously been disciplined.

"*Inexperience in the Practice of Law.* The Respondent was relatively inexperienced when the violations occurred. Inexperience could be an explanation for some of the Respondent's actions. An additional explanation could be the lack of a mentor. The evidence presented to the Hearing Panel was that the Respondent and three of his law school classmates formed a partnership following graduation and passing the Bar. This lack of an experienced lawyer in the firm probably lead to one of the Respondent's transgressions in the Nobles' case—advertising expertise, and accepting representation in a federal employment discrimination case, when no expertise in employment discrimination matters or federal court practice existed. Inexperience also undoubtedly lead to a series of incredible actions in the Nobles' case, including failing to file the initial disclosures required by Fed. R. Civ. P. 26(a), failing to initiate any discovery in the case, failing to appropriately respond to defendant's motion for summary judgment, filing a frivolous appeal to avoid a malpractice suit by Mr. Nobles, failing to file a timely brief or obtain appropriate extensions of time to do so, and, finally failing to withdraw from the appellate proceeding when 'terminated' by Mr. Nobles. *See* Findings of Fact, ¶¶ 1-2, 16, 20-21, 26-18, 33-34, *supra.* Inexperience may be forgiven. In this case, however, the Hearing Panel is forced to deal with the Respondent's testimony and demeanor at the hearing on November 15, 2000. The Respondent can no longer be labeled inexperienced. Instead of conceding the above-described actions were due to inexperience, the Respondent testified to a series of justifications that were, in the opinion of the members of the Hearing Panel, incredible. If, in fact, the Respondent's testimony under oath at the hearing is to be believed, he still lacks the competency required to practice law in the State of Kansas.

"*Previous Good Character and Reputation in the Community Including any Letters from Clients, Friends, and Lawyers in Support of the Character and General Reputation of the Attorney.* The letters submitted by the Respondent from his friends and colleagues indicate that the Respondent enjoys a good reputation in his community.

"In addition to the above-cited factors, the Hearing Panel has thoroughly examined and considered Standard 4.42. That standard provides, in pertinent part:

'Suspension is generally appropriate when:
'(a) a lawyer knowingly fails to perform services for a client and causes injury or potential injury to a client; or
'(b) a lawyer engages in a pattern of neglect and causes injury or potential injury to a client.'
Based upon the testimony and argument presented, the demeanor of the witnesses, the corroboration of the evidence, the exhibits admitted into evidence, and the briefs filed after the close of the evidence, the Hearing Panel unanimously recommends that the Respondent be suspended from the practice of law in the State of Kansas for a period of two (2) years."

## DISCUSSION

To warrant a finding of misconduct, the charges must be established by clear and convincing evidence. Supreme Court Rule 211(f) (2000 Kan. Ct. R. Annot. 250); *In re Harris*, 261 Kan. 1063, 934 P.2d 965 (1997). A hearing panel's report is deemed admitted under Rule 212(c) and (d) (2000 Kan. Ct. R. Annot. 254) when respondent fails to file exceptions. *In re Farmer*, 263 Kan. 531, 950 P.2d 713 (1997). *See In re Howlett*, 266 Kan. 401, 969 P.2d 890 (1998). No exceptions have been filed to the panel's report. We conclude the panel's findings of fact are supported by clear and convincing evidence and fully support the panel's conclusions of law. The panel's findings and conclusions are adopted by this court. This leaves the matter of determining the appropriate discipline to be imposed.

Much of the misconduct here concerns lack of diligence and failure to communicate with clients. These are serious failings but are of a nature that may be remedied by future heightened diligence and improved office procedures. There is, however, nothing in the report to indicate respondent comprehends the seriousness of these matters or the need to handle his practice differently in the future. Further, the final hearing report has disturbing comments and determinations as to deeper, less easily remedied, problems that reflect upon respondent's basic competence to practice law. It is also obvious respondent left the panel with a bad impression of his attitude regarding the disciplinary proceedings. Respondent's failure to proceed with discovery in the Nobles case, explained as trial strategy of playing it close to the chest until after the discovery deadline and summary judgment in order to keep

the other side in the dark, shows a basic ignorance of the law. He also maintained to the panel that a motion to show cause why an appeal should not be dismissed for failure to prosecute is really just a 2-week extension in which to file an overdue brief. This is clearly a gross misinterpretation of basic legal proceedings which is particularly offensive to this court. We also note the panel found many instances where respondent's testimony as to contested facts was not credible.

The panel has recommended suspension from the practice of law for a two-year period. After careful consideration, we conclude indefinite suspension is the appropriate discipline in this case.

IT IS THEREFORE ORDERED that Bradly W. Johnson be and he is hereby indefinitely suspended from the practice of law in the state of Kansas, commencing with the date of this opinion.

IT IS FURTHER ORDERED that Bradly W. Johnson comply with Supreme Court Rule 218 (200 Kan. Ct. R. Annot. 266), that he pay the costs of this action, and that this order be published in the Kansas Reports.